STATE v. ADDY.

1. The judge must carefully avoid expressing an opinion on the facts, leaving it to the jury to draw their own conclusions entirely unbiassed by any impression which the testimony may make upon the mind of the judge. He must not in any way indicate his opinion of the facts to the jury.
2. The judge charged upon the facts in this case, in intimating to the jury that he did not believe defendant's testimony, and in cautioning them against accepting as true the statements made by a man when on trial for his life.

Before PRESSLEY, J., Lexington, September, 1886.

The charge of the judge to the jury was as follows:

GENTLEMEN: We have a very serious, very important, and very solemn duty to perform. I, as a judge, am under oath, and you, as jurymen, are under oath also. We owe a duty to ourselves, to the defendant, to the country, and to God. I never

try one of these cases but I endeavor, calmly and deliberately, to acquit myself of every shadow of blame in the matter. I never try to bear heavily upon the prisoner, but I never shrink from what I believe to be my duty to the case which is before me, according to the testimony as given. I believe if a man has been murdered and it be proved, and I do anything to let him escape, some of the blood of the murder rests upon my skirts. That's the way I feel about it. I do not intend to have anything of that sort to reflect upon in my after-life. It would be a sad thought to me if I could believe that I had ever borne heavily upon an injured man who was tried for his life, or ever permitted room for him to escape if his guilt was proved. Let us come to a consideration of this case with that feeling in our minds. We listen to impassioned eloquence of counsel, and, of course, it moves us, but we must take time to cool and not allow it to move us against our convictions as to the truth.

It is admitted on all hands, that the defendant killed the deceased. He is, therefore, guilty of something, unless he has satisfactorily made out a case of self-defence. That is a proposition so simple that any man can understand it. He has killed a human being, and sent him without warning, without time for repentance, away from his country, away from his friends and family; sent him to answer before his God. He has done that, and he is guilty of something unless he has made out satisfactorily a case of self-defence. Has he done that? The first inquiry is, has he made out a case of self-defence? What are the circumstances of the case? He went to a public meeting, carrying a concealed weapon; carrying a pistol in his hip pocket. No evidence came before the jury that anybody had threatened him, or that he was in fear of danger from anybody whatever, and, therefore, carried that pistol to defend himself against an attack; that he, being a weakly man, having lost one arm, had been threatened by some one too strong for him, and was carrying that pistol to defend himself. There is no evidence of that sort. We are bound to look with disfavor upon one who is wilfully violating the law in carrying a concealed weapon to a public assembly of neighbors.

We find him during that day doing some matters which may

have been very trifling, and which may have been merely innocent things, and yet which some persons of irritable temper might suppose were intended to irritate. One of the witnesses says that during that day he leaned upon the deceased, who was near a pit of fire; that deceased said to him, "Don't push me into the hot ashes." At another time a different witness says that he put his hand upon the shoulder of the deceased's little girl, and acted as if he was going to push her into the pit. Whether it was mere sport, he intending just simply to have a play with the child, or whether he intended thereby to irritate the deceased in doing something to him, I do not know. They are circumstances to be taken in connection with what happened thereafter. It may have been mere sport; one would have so inferred it to be if nothing had happened afterwards. It may be a thing of no importance, but still it is one of those things you will have to weigh. Subsequently he goes to the brother of the deceased and said he wanted to buy some pork, and witness (the brother) said, "I referred him to my brother," and he says the defendant replied with an oath he would not go to him; the witness, the brother of the deceased, thereupon said, " 'I will go with you.' I went with him to where the barbacue was; there was no pork there, and we then went to the table." You heard his testimony as to what occurred there. These are things which preceded this sad ending of the matter; whether they showed he had any ill-will against the deceased or not, it is not for me to say. They are circumstances upon which you will have to ·weigh.

Now, from that time on to the main point of the case, every witness who has been examined on the part of the State and on the part of the defence, in so far as they testified at all to any facts they saw, they all agree as to the material facts of the case. Twelve witnesses have been examined, about one-half for the State and nearly one-half for the defence. They all agree in the main as to what took place; the defendant himself contradicts all the other witnesses. His testimony stands alone in reference to those circumstances going to make up a case of self defence; stands alone, unsustained by a single witness on his side. What do they all say, all who were near enough to hear what he said after he was told to put down the mutton which he was crying?

They all say that with an oath he said, "If you come out yonder, you can get anything you want." Others say that he said something, but they did not hear what it was. All who were near enough to hear, say he did say something; that he thereupon started off outside, and was immediately followed by the deceased. One witness, the brother of the deceased, says he stopped at the door and put his hand behind him. No other witness testifies to that; no other witness speaks of his stopping; they all say he went out, that the deceased followed him, and struck him on the back of the head and knocked him down. They all agree. All who profess to have seen what happened afterwards, say that the blow was not followed up either by any other blow or by any attempt to strike. No one speaks of his having been knocked senseless; two colored witnesses say he fell back and was trembling, but they don't say he was knocked senseless.

If you then take as true the testimony of all the witnesses, leaving his out, is it a case in which he could honestly believe that he was in danger of life, or of receiving serious bodily harm? If the blow had been given, and he was knocked down, and it then ceased, what was the danger of his receiving serious bodily harm? In order for him to justify it under the plea of self-defence, he must have believed so honestly. That is the first proposition laid down in the book from which Major Meetze read to you; he must have honestly believed he was in danger of his life, or of receiving bodily harm. For the circumstances of the case, as they would, at that time and under those circumstances, appear to a man of ordinary firmness and reason, must be such as to justify that belief. Now, gentlemen, if you take the testimony of the witnesses for the State, and you can come to the conclusion that he honestly believed that his own life was in danger, or that he was in danger of receiving bodily harm, and the circumstances of the case, as they would appear at that time to a man of ordinary firmness and reason, justify him in so believing, then the case of self-defence is made up, because that is what the law requires.

Now, come to his own testimony. He is testifying in defence of his own life; his testimony should be received with very great allowance; the same law which says the one, says the other—he

who is testifying to save his own life, his testimony must be received with very great allowance. What is your own belief in this matter? Is there one man in a hundred, is there one man in a thousand, taking human nature as it comes, who, under these circumstances, can resist the inclination to sway from the truth? Gentlemen, you are bound to make this allowance, because of the circumstances under which he testifies. The question still is, do you believe what he says? First, it contradicts all the other witnesses who profess to have seen him. Next, is it consistent with the circumstances; is what he says about the matter consistent with the circumstances of the case? Suppose he wasn't contradicted by an array of other witnesses, what are the circumstances? He says himself that he was in the hands of a powerful man, a man weighing from 170 to 175 pounds—a strong, powerful man of bone and muscle. He himself, as you see, is a one-armed man, and he says he is otherwise weakly from bad health; he is not a large man. Now, gentlemen, you are bound to ask yourselves this question: if that strong, powerful man knocked him down senseless on the ground and was following it up in such a manner as to endanger his life, or to inflict upon him serious bodily harm, could that possibly have happened without serious bodily harm having been inflicted upon him? without his being so disabled that he could not have drawn that pistol and shot? You are bound to consider that matter; you are bound to weigh it in the light of reason; that strong, powerful man having knocked him down, and standing there right by him, would it not have been entirely easy for him to have wrested that pistol from him with that one arm of his? I am bound to bring these matters to your attention; they are questions which you are to consider, not me; but I call your attention to them now.

Gentlemen, considering all these matters, the fact that he is contradicted by the other witnesses, considering them all, weighing them carefully, and making allowances, which you are bound to make in his testimony, has he made out a case in which his own life was in danger, or was he in danger of receiving bodily harm, or in which he honestly believed such was the case, and that the circumstances justified that belief? If he has not made out such a case, then he is guilty of something; and what is that

something he is guilty of? If he didn't provide himself with the pistol to provoke a quarrel with the intention to use it when he was struck : then if he was struck by the deceased in the manner prescribed, and in sudden heat and passion used that pistol, then his guilt is that of manslaughter, if that be the case. It is said he did nothing more than any other man would have done under the same circumstances. Well, gentlemen, it is because human nature is frail, and because other men are likely to do that under those circumstances, that the law makes an allowance mitigating the offence to manslaughter. It is simply because other men would do that very thing under those circumstances that the law says it is not murder; but, nevertheless, it must be punished; and punished as manslaughter; but because human nature is frail does not follow that it must not be restrained. The fact that the majority of men would do these things does not make him not guilty. It won't do to say that you or I would have done the same thing. Do it or not do it, the law says it is manslaughter; but is it manslaughter only?

Well, gentlemen. if he has not made out a case of self-defence, then it is murder if he prepared that pistol in advance for the purpose, and if he provoked this quarrel and bantered this man and provoked him to strike him, intending to use the pistol after he was struck, that is wherein murder and manslaughter differ— one who prepares a deadly weapon to use in a fight, and provokes the other man to strike him, intending to shoot when he is struck, is guilty of murder. Unless you have reasonable proof, so much so as to leave upon your minds reasonable doubt, then you are not at liberty, if he did so intend to use it in advance, to say it wasn't murder.    *    *    *

The questions of law pertaining to this case are as simple as A, B, C. It is a question of fact for you. Has he made out a case of self-defence? Did he believe he was in danger of receiving bodily harm, and do the circumstances of the case existing at that time justify that belief? That is a rule of self-defence, if he did so believe; but you are to satisfy yourselves from the circumstances detailed to you by the witnesses that they, as they existed, justified that belief. Then, as a matter of course, self-defence is made out. If self-defence is not made out: if after

receiving the blow he shot in sudden heat and passion, he is guilty of manslaughter. If he prepared for anything beforehand, and provoked a quarrel, intending to use the pistol, then if he shot even after receiving the blow, he is guilty of murder. These are the three points involved in the case, which you will consider.

*Messrs. Meetze & Muller* and *Efird* and *S. W. Melton*, for appellant.

*Mr. Nelson*, solicitor, contra.

February 1, 1888. The opinion of the court was delivered by

MR. JUSTICE MCGOWAN. The defendant was indicted for the murder of Josephus Swygert at a barbecue dinner given on the premises of one Risenger, of Lexington County, in August, 1886. There is before us no "Case settled," but instead, all the voluminous testimony just as it was delivered on the stand. Briefly, it appeared that the deceased was one of those who had provided the barbecue dinner, and the defendant, a neighbor, was present as a patron. It did not appear that there had been any previous quarrel between the parties, but during the day when the deceased was at the pit, where the meat was being roasted, the defendant was seen to lean on him, so as to provoke the remark, "Don't push me into the hot ashes;" and at another time he put his hand, as if playfully, upon the shoulders of the little daughter of deceased, and acted as though he was going to push her into the pit. Towards the close of the feast the defendant approached J. C. Swygert, a brother of the deceased, at the lemonade stand, and proposed "to buy a piece of pork." He was told that the deceased, who was at the meat table, would sell it to him, but he declined making application to him; whereupon the brother went with him to the carving table where the deceased was, and said to him, "Dixon [defendant] wishes to buy a piece of pork." He was told the pork was out, but there was a very nice piece of beef. This the defendant declined to take, and took up from the table a piece of mutton and commenced crying it aloud, as if selling it at auction to the highest bidder. The deceased said, "Stop that, I don't want any foolishness here." Where-

upon the defendant dropped the piece of meat, and retired, saying as he went, "If you want anything, come out here," or something of that character. The deceased did follow him and knocked him down with his fist, and as the defendant rose, or was in the act of rising, he drew from his pocket a pistol and discharged it at the deceased several times, two of the shots taking effect on his body and killing him almost immediately. The deceased was a stout, muscular man, and the defendant was more feeble and had but one arm. The plea was self-defence.

After much testimony, the case was submitted to the jury, and under the charge of the judge (which should appear in full in the report of the case), they found the defendant "guilty of manslaughter," and he appeals to this court upon fourteen exceptions, which are also in the Brief; but from the view which the court takes, it will not be necessary to state any of them here, except the last seven, which are as follows:

"8. Because his honor erred in charging the jury in respect to matters of fact, so as to control their discretion in determining the degree of credibility which they should attach to the testimony of the prisoner; and so as plainly to indicate the opinion of the court that the prisoner should be convicted of some offence; and so as to bias their judgment and influence and control their verdict against the prisoner.

"9. Because his honor erred in charging the jury that the testimony of the prisoner on trial for his life must be received by the jury 'with very great allowance; is there one man in a hundred, is there one man in a thousand, taking human nature as it comes, who, under these circumstances, can resist the inclination to sway from the truth?' &c.

"10. Because his honor erred in charging the jury in respect to matters of fact, that they might regard the conduct of the prisoner towards the deceased and towards his child as 'mere sport,' not intended to irritate the deceased and provoke the quarrel, if nothing had happened afterwards; thereby inducing the jury to infer from the fatal result that, in the opinion of the court and in fact, the prisoner did mean by such conduct to irritate and provoke a quarrel, and thereby controlling the jury to

deny to the prisoner an impartial and unbiassed consideration of his plea of self-defence.

"11. Because his honor erred in charging the jury upon matters of fact, that the prisoner was contradicted by all the other witnesses, all of whom were said to have agreed in the main as to what took place—'the testimony of the prisoner standing alone, unsustained by a single witness, in reference to those circumstances going to make up a case of self-defence,' &c.; whereas it is submitted that the testimony of the other witnesses does not agree in many particulars material to this defence, and that in many such particulars the testimony of the prisoner was sustained by several other witnesses, &c.

"12. Because his honor erred in charging the jury upon matters of fact, by impressing them with his own opinion, and thereby inducing them to find that the prisoner could not have honestly believed that he was in danger of his life or of serious bodily harm, for the reason that the prisoner being weak in strength and one-armed, and the deceased a strong and athletic man, the deceased did not, in fact, inflict serious bodily harm upon the prisoner; this, when according to the evidence, the deceased without adequate provocation, while the weak one-armed man was walking away from him, had felled him to the ground by a powerful blow on the back of his head.

    *     *     *     *     *     *     *

"14. Because his honor erred in charging the jury as follows: 'I believe if a man has been murdered and it be proved, and I do anything to let him escape, some of the blood of the murder rests on me. That is the way I feel about it. I do not intend to ever have anything of that sort to reflect upon in my after life. It would be a sad thought to me if I could believe that I had ever borne heavily upon an injured man who was tried for his life, or ever permitted room for him to escape if his fault was proved,' whereas it is respectfully submitted that if his honor deemed it necessary to define the duty of the court, it should have been done in accordance with the provisions of the constitution—disclaiming all responsibility except such as may be involved in declaring the law, and impartially stating the evidence in such manner and in such terms as to leave to the jury the

exclusive determination of the facts, without reference to the opinion of the court as to the guilt of the prisoner ; and whereas it is further respectfully submitted, the whole tenor, substance, manner, and effect of the charge, contrary to the requirements of the constitution in this regard, did constrain the jury to adopt as their conclusion the opinion of the court, emphasized by argument on the facts, that the prisoner was 'guilty of something.' "

Section 26 of article IV. of the Constitution declares that "judges shall not charge juries in respect to matters of fact, but may state the testimony and declare the law." As has been stated in several of our cases, there is no more difficult duty imposed upon this court than that of fixing, under this provision, the exact line which bounds the province of the trial judge in respect to matters of fact. This difficulty arises largely from the vague and undefined nature of the subject, and the infinite combinations of circumstances which are developed in the administration of the law. The judge undoubtedly has the right to state the testimony and in its proper order, and it is easy to see how a conscientious officer, intent upon the proper administration of the law, and the punishment of those believed to be guilty, may unconsciously transcend the very shadowy outlines of his constitutional domain. But when the question is made, we have no option but to discharge our duty as best we may. So far as a rule upon the subject can be absolutely fixed, we think it well established in this State, "that the judge must carefully avoid expressing an opinion on the facts, leaving it to the jury to draw their own conclusions entirely unbiassed by any impression which the testimony may make upon the mind of the judge. * * * He must not in any way indicate his opinion of the facts to the jury," &c. See *Redding* v. *Railroad Company*, 5 *S. C.*, 69 ; *State* v. *White*, 15 *Id.*, 381 ; *Benedict* v. *Rose*, 16 *Id.*, 629 ; *Sharp* v. *Kinsman*, 18 *Id.*, 108 ; *State* v. *Summers*, 19 *Id.*, 91 ; 21 *Id.*, 595 ; and 24 *Id.*, 59.

Taking this as our guide, and reading the whole of the charge, not in a critical spirit but with all proper allowances, we cannot resist the conclusion that the judge did charge the jury upon matters of fact. Without referring specially to other parts of the charge objected to, it seems to us obvious that the judge did

not believe the testimony of the defendant, and that he strongly indicated that impression to the jury, by what, in effect, was an argument terse, compact, and forcible. He called attention to the fact that he was swearing for his own life, and asked the question, "Whether there was one man in a thousand who, under those circumstances, could resist the inclination to sway from the truth?" He stated that his testimony was not only contradicted by the whole array of the other witnesses and the circumstances of the case, but plainly indicated that it was inherently incredible—saying, "he himself, as you see, is a one-armed man, and he says he is otherwise weakly from bad health; he is not a large man. Now, gentlemen, you are bound to ask precisely this question : If that strong, powerful man knocked him down senseless on the ground and was following it up in such a manner as to endanger his life, or to inflict upon him serious bodily harm, could that possibly have happened without serious bodily harm having been inflicted on him?" The question is not whether the judge's impression of the facts was in itself right or wrong, but whether it was error to indicate that impression to the jury.

The research of the counsel for the defendant has enabled him to bring to our attention quite a number of cases in other States having similar laws to our constitutional provision, which show that the inhibition against the judge charging on the facts is generally enforced with strictness. It is believed that most of the States in the Union have some regulation upon the subject. Several of them have constitutional provisions identical with our own. In *Whitley.*v. *State* (38 *Ga.*), it was held "that the charge in a criminal case should explain the law, but should contain no argument upon the facts. The tribunal of inference is the jury, and the jury alone. Not only are they to judge what facts are established, but they are to draw their own conclusions from them, uninfluenced by any impressions made by the testimony upon the mind of the judge. His convictions should not be declared or intimated." See also *Brewster* v. *Georgia,* 63 *Ga.*, 639.

In the *State* v. *Vasquez* (16 *Nev.*, 42), the trial judge had charged "that in all cases jurors should receive such testimony (of the accused) with great caution ; for when one is being tried for a capital offence, the temptation to pervert or distort the facts

in favor of himself is very great." Held, "that upon principle as well as upon authority, the last portion of the instruction quoted cannot be upheld. Courts cannot so charge juries as to impress upon their minds that any witness has testified falsely. Jurors may be informed as to the matters to be considered in determining the credibility of witnesses, but they cannot be instructed directly or indirectly, that any witness has perverted or distorted the facts. And when a defendant in a criminal case makes himself a witness, he has the right to have his testimony received and considered according to the rules adopted in relation to other witnesses." In *State v. Ah Tong* (7 *Nev.*, 148), it was held that "the judge should intimate no opinion upon the facts. If he cannot do so directly, he cannot indirectly ; if not explicitly, he cannot by innuendo ; and the effect of such an opinion cannot be obviated by announcing in distinct terms the jury's independence of him in all matters of fact. One of the objects stated to be guarded against, is the well known proneness of juries to seek to ascertain the opinion of the judge, and to shift their responsibilities from themselves to the court. * * * Any instruction from which inferences plainly prejudicial to the defendant can be drawn, is erroneous."

In *Ivey v. Hodges*, 4 *Hump.*, 154 (Tennessee), the court say : "This provision arose out of the jealousy with which our ancestors always looked upon any attempt on the part of courts to interfere with the peculiar province of the jury—the right to determine what facts are proved in a case—and to put a stop to the practice of 'summing up,' as it was and is yet practised in the courts of Great Britain, which consists in telling the jury, not what was deposed to, but what *was proved*. This the framers of our constitution considered a dangerous infraction of the trial by jury, and have prohibited it by express terms. 'Judges shall not charge with respect to matters of fact,' that is, shall not state to the jury what facts are proved ; to do so is error, for which a case must always be reversed. But not being disposed to withhold from the jury any proper aid which the judges may be enabled to render them in their investigation, they have provided that they may 'state the testimony'—that is, may, for the purpose of refreshing the memory of the jury, inform them what

facts the different witnesses deposed to (and arrange them in order), leaving them to judge of the truth thereof and draw their deductions therefrom," &c.   See *State* v. *Rogers*, 93 *N. C.*, 523; *Ross* v. *State*, 29 *Texas*, 499; *Commonwealth* v. *Barry*, 9 *Allen* (Mass.), 276; *People* v. *Williams*, 17 *Cal.*, 142; &c.

The judgment of this court is, that the judgment of the Circuit Court be reversed without prejudice, and the case remanded to the Circuit for a new trial.